**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA**

| | | |
|---|---|---|
| ARVINE R. BOWEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **4:07CV3116** |
| vs. | ) | |
| | ) | **MEMORANDUM** |
| MICHAEL J. ASTRUE, Commissioner of | ) | **AND ORDER** |
| the Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff, Arvine R. Brown, seeks review of a decision by the Commissioner of the Social Security Administration denying his applications for disability insurance supplemental security income benefits.  After carefully reviewing the administrative record and the parties' written arguments, the court concludes that the SSA decision should be affirmed.

## I.  PROCEDURAL BACKGROUND

This suit involves an application made under the Social Security Act (Act) for Supplemental Security Income (SSI) made under Title XVI of the Act, 42 U.S.C. §§ 3181 *et seq*.  Section 1631(c)(3) of the Act, 42 U.S.C. § 1383(c)(3), provides for judicial review of a final decision of the Commissioner of the Social Security Administration.

Plaintiff filed previous applications for SSI on January 23, 2000, and December 13, 2001.  Those applications were denied through the administrative process, which ended when an Appeals Council of the Social Security Administration denied Plaintiff's request for review on March 31, 2004.

Plaintiff filed his current application for SSI on March 31, 2004.  The application was denied initially and on reconsideration.  After a hearing, an Administrative Law Judge (ALJ) issued a

decision dated August 19, 2005, finding the plaintiff to be disabled and entitled to benefits under the Act. This decision was based largely on the spinal physical capacity evaluation completed in December 2002 by Dr. Dennis McGowan, an orthopedist. (*See* Tr. 339-346; 812:811-812).

On September 22, 2005, however, the Appeals Council reviewed the August 2005 ALJ decision on its own motion and issued a Remand Order dated December 28, 2005, to obtain additional medical and vocational evidence concerning Plaintiff's claim.

The ALJ conducted a supplemental administrative hearing in May 2006, and issued a decision on August 3, 2006, determining that plaintiff was "not disabled" based on his application of March 31, 2004.

On March 1, 2007, the Appeals Council of the Social Security Administration denied plaintiff's request for review. Thus, the August 3, 2006, decision of the ALJ stands as the final decision of the Commissioner and is the subject of this case.

## II.  FACTUAL BACKGROUND

The record shows that the plaintiff was born on February 25, 1963. He completed high school in 1983 by participating in special education. He also went to the  Job Corps to learn how to be a cook, but did not complete that program. (*See* Tr. 499-519; 821). He filed the current application on March 31, 2004, alleging disability due to spinal arthritis and knee problems.

In March 2002, the plaintiff was treated for back pain by Dr. Dennis McGowan, an orthopedic surgeon. At that time, plaintiff complained of significant back pain. An MRI taken March 19, 2002 showed that the alignment of plaintiff's lumbar spine was within normal limits. There was mild disk space narrowing at the L4-5 level. Degenerative disk signal was present at the L4-5 and L5-S1 levels. The remainder of the disk levels were unremarkable. There was no evidence

of a marrow replacement process. The conus was present at the T12-L1 level. The L2-3 and L3-4 disk levels were within normal limits. The L4-5 and L5-S1 levels demonstrated a mild broad based disk bulge with no significant central canal or neural foraminal stenosis. The diagnostic impression was mild degenerative changes at the L4-5 and L5-S1 levels. There was no evidence of a focal disk herniation or significant central canal or neural foraminal stenosis.

X-rays taken on March 19, 2002 showed mild dextroscoliosis of plaintiff's lumbar spine and some disk space narrowing at the L5-S1 level. The remainder of the disk space heights appeared to be maintained. Small anterior osteophyte formation was present at the L4-L5 level. The soft tissues were unremarkable. The diagnostic impression was (1) mild dextroscoliosis of the lumbar spine, and (2) mild degenerative changes at the L4-L5 and L5-S1 levels.

Procedures consisting of (1) a left L2 dorsal root ganglion block and (2) left L3, L4, L5 and S1 posterior medial branch blocks, were performed on March 20, 2002. Dr. McGowan's notes reflect that the left-sided low back blocks significantly helped plaintiff's left sided pain. Therefore, on June 14, 2002, Dr. McGowan performed procedures consisting of (1) a right L2 dorsal root ganglion block and (2) right L3, L4, L5 and S1 posterior medial branch blocks.

Dr. McGowan completed a Spinal Physical Capacity Evaluation or checklist covering the period from February 2, 1999 to December 25, 2002. The handwritten diagnostic information on the form is largely illegible. The evaluation does reflect Dr. McGowan's opinions that plaintiff was not a malingerer and emotional factors did not contribute to the severity of plaintiff's symptoms. Dr. McGowan reported that plaintiff's symptoms were frequently severe enough to interfere with attention and concentration, and plaintiff's prognosis was "guarded at best." (Tr. 341). Plaintiff's impairments had lasted or could be expected to last at least 12 months. The evaluation states that

-3-

plaintiff could walk 3 city blocks without rest, continuously sit for 15 minutes at a time, and continuously stand for 30 minutes at a time. He could sit about 2 hours per 8-hour working day and stand/walk about 4 hours per 8-hour working day. Plaintiff would require periods of walking around during an 8-hour working day and would need to walk every 15 minutes for 5 minutes. He would require a job permitting him to shift positions at will from sitting, standing or walking and would need to take unscheduled 5-minute breaks each hour during an 8-hour working day. The plaintiff would not need to use a cane or other assistive device while engaging in occasional standing or walking. Plaintiff would be able to lift 35 pounds occasionally in a competitive work situation and did not have significant limitations in doing repetitive reaching, handling or fingering. The plaintiff could not do any work that would require him to bend and twist at the waist. His impairments were likely to produce good days and bad days, and Dr. McGowan anticipated the plaintiff would likely be absent from work about twice a month. Plaintiff's limitations restricted him to a maximum 6-hour work day and he would be unable to sustain work at a fast pace. His maximum work load on a sustained workday basis would be 4 days per week, but less than a full week. The earliest date to which Dr. McGowan's description of plaintiff's limitations and symptoms applied was January 1, 2002.

On March 28, 2002, the plaintiff underwent a consultative psychological evaluation by Lee Kimzey, Ph.D., at the request of the Disability Determination Section. This is the most recent psychological evaluation in the record. Dr. Kimzey's report (Tr. 673-676) states that plaintiff was 6 feet 10 inches tall and weighed about 368 pounds. Plaintiff was pleasant and cooperative and appeared to understand the purpose for the interview "in a rudimentary sense."

-4-

Plaintiff was born in North Platte, Nebraska and lived there until his family moved to Ft. Morgan, Colorado, where plaintiff completed his junior and senior years in high school. Plaintiff told Dr. Kimzey he received special education assistance throughout school and, within the context of his special placement, received A's and B's. Plaintiff has never been married. He has no children.

Plaintiff worked as a furniture mover for a moving and storage company off and on when needed for about 15 years. He last worked there in February 2001. Plaintiff also performed a variety of odd jobs through the local employment office. He worked for the Salvation Army and has done lawn mowing. He worked for Wal-Mart but was let go after Wal-Mart realized he had been convicted of a felony. In this regard, plaintiff told Dr. Kimzey that in 1986, he was convicted of sexually assaulting his nieces, which he denied doing. He told Dr. Kimzey that eventually it was discovered that his ex-brother-in-law harmed these children and, as a result, he was released from prison.

During the March 28, 2002 evaluation, plaintiff was administered the WAIS[1]-III, earning a verbal IQ of 67, performance IQ of 78, and full-scale IQ of 70. His functioning was within the borderline range of intellectual functioning, and his insight and judgment seemed reasonable. Dr. Kimzey noted that plaintiff put forth good effort on his testing protocol and his scores were perceived as a valid representation of his abilities.

Dr. Kimzey noted no apparent restrictions regarding the activities of daily living. Plaintiff did appear capable of understanding and recalling short and simple instructions. Dr. Kimzey anticipated that plaintiff could carry out his duties with ordinary supervision. Sustained concentration and attention appeared commensurate with his native abilities. His ability to relate to

---

[1]Wechsler Adult Intelligence Scale.

coworkers and supervisors would seem to be good, and plaintiff appeared to have the capacity to adapt to change.

Dr. Kimzey made the following diagnosis:

Axis I:     V71.09  No Diagnosis
Axis II:    V62.89  Borderline Intellectual Functioning
Axis III:   Reported arthritis in his spine, knee pain, post-fractured pelvis at age 14
Axis IV:   Occupational and economic difficulties
Axis V:    GAF–52

Dr. Kimzey concluded that plaintiff did not have any chronic or acute emotional disorder; however, he had substantial cognitive limitations that were not likely to change.  Although plaintiff reported he was capable of managing his own finances, some oversight was recommended.

On January 15, 2004, plaintiff received medical treatment at the Memorial Health Center in Sidney, Nebraska for back pain.  Plaintiff advised that he fell on the ice on January 12, 2004 and complained of a constant and deep pain in the low thoracic and high lumbar region.  His pain scale rating was 5 over 10.  He gave the doctor a long history of back problems and stated he had been under treatment for such in numerous areas.  The plaintiff appeared to be mentally challenged.

The treating physician, Dr. Michael L. Matthews, observed that plaintiff was a very large man, being approximately 6 feet 10 inches tall and weighing 340 pounds.  Plaintiff was able to answer question and follow most commands, but appeared to be rather slow.  He ambulated with a very unusual gait.  Plaintiff told Dr. Matthews that he had advanced degenerative joint disease of both knees.  There was some point tenderness over the spinous process of the low thoracic region and of the high lumbar area.  Plaintiff's mobility was limited in all planes, but especially in forward bending; he could only reach to approximately the level of his knees.  Plaintiff reported that he had a great deal of problems in many activities throughout the day.

-6-

A diagnostic radiology report dated January 16, 2004 shows that the radiologist obtained views of the thoracic spine and lumbar spine. The radiologist saw no acute abnormality in plaintiff's thoracic spine. He did observe minimal scoliosis and a mild degree of degenerative spondylitic ridging. The radiologist observed signs of degenerative disk disease in plaintiff's lumbar spine, primarily at L4-5 and L5-S1. He observed bony ridging at both those levels with some encroachment on the spinal canal. No acute injury was seen. The pedicles and spinous processes, as well as transverse processes, were normal. There were five functioning lumbar vertebral bodies.

Dr. Matthews prescribed physical therapy and recommended a course of exercises. The physical therapist and Dr. Matthews noted that plaintiff's rehabilitation potential was good. They planned three sessions per week for four weeks with treatment consisting of flexion exercises, electrical stimulation, ultrasound, and therapeutic exercise. They recommended that plaintiff avoid long-term sitting, and that plaintiff walk and move around as often as possible and do therapy exercises at least twice per day. Plaintiff attended three physical therapy sessions. He called the clinic on January 26, 2004 and cancelled all of his physical therapy appointments because there was a death in the family. Plaintiff did not return to physical therapy and his records at that facility were discontinued on March 23, 2004.

On April 9, 2004, a SSA field officer interviewed plaintiff by telephone for purposes of completing an Adult Disability Report. (Tr. 596-604). Plaintiff was cooperative. The interviewer did not observe or perceive any difficulties with plaintiff's hearing, reading, breathing, understanding, coherency, concentrating, talking, or answering. At that time, plaintiff reported he was 6 feet 10 inches tall and weighed 295 pounds. Spinal arthritis and the condition of both knees limited his ability to work. Plaintiff stated he could only work for about 4 hours per day with 15

-7-

minute breaks every hour.  His conditions were painful, and he said he became unable to work as of December 15, 2003.  Plaintiff stated he stopped working on January 30, 2000 because of back pain.

Plaintiff reported the following work history for the prior 15 year period:

| Job Title | Type of Business | Dates Worked | Hours/day | Days/week | Pay |
|-----------|------------------|--------------|-----------|-----------|-----|
| construction | construction | 1990-1993 | 8 | 7 | $6/hour |
| furniture mover | furniture moving company | 1999-2000 | 8 | 2 | $10/hour |
| painting | house painting | 1998-1999 | 8 | 6 | $6/hour |
| spot jobs | various | 1985-2000 | 3 | 2 | $6/hour |

In his construction job, plaintiff worked tearing up the interstate, loading trucks, supervising, and washing out cement trucks.  He used machines, tools or equipment, but did not use technical knowledge or skills and did not do any written work.  He would walk for two hours per day and stand eight hours per day on the construction job.  The job required stooping, crouching, and handling or grasping big objects, reaching, and frequently lifting or carrying loads (concrete) up to 20 pounds.

Plaintiff reported he had been seen by a doctor for the conditions that limited his ability to work.  He said he had consulted Dr. Michael Matthews in Sidney, Nebraska for back and knee problems and for high blood pressure.  At the time of the April 9, 2004 interview, plaintiff reported taking medication for high blood pressure and ibuprofen for back pain.

Plaintiff was examined by Dr. Leland F. Lamberty on June 15, 2004.  Dr. Lamberty had examined plaintiff previously, in 2002.  The doctor noted in his report (Tr. 687-693) that plaintiff's primary complaints were of chronic pain and arthritis in his knees and back.  Plaintiff had worked

-8-

as a furniture mover for the 10 years until 1999, at which time he was unable to work.  Plaintiff told Dr. Lamberty that he had evaluations for both his back and knees by orthopedic physicians in Kearney, Nebraska and was told he had significant arthritis of the mid and upper back and that both knees were short because of arthritis.  Plaintiff stated he did minimal walking and he complained of chronic pain.   He stated the only medication he was taking was Tylenol because of cost considerations.  He denied any swelling in the knees.  Plaintiff had injured his left upper extremity in a motorcycle accident in the mid 1990s, but the injury does not bother him now.  He fractured his right leg in a motor vehicle accident in 1976, but that injury did not seem to be creating a problem.  At the time of this examination, plaintiff weighed 325 pounds.  He denied having headaches, dizziness, chest pain, shortness of breath, indigestion, bowel or bladder problems, or peripheral edema.

Dr. Lamberty described plaintiff as a very large gentleman who was wheeled back to the room in a wheelchair.  Dr. Lamberty had plaintiff get out of the wheelchair and on to the table "which he was perfectly capable of doing," and then had plaintiff walk all the way back to x-ray halfway across the building.  Plaintiff was able to accomplish this with some complaint of discomfort, "but seemed to walk perfectly normally."  Plaintiff was alert and oriented by did seem to be a little bit slow mentally.  No abnormalities or problems were observed as to plaintiff's head, eyes, ears, mouth, throat, neck, chest, heart, or abdomen.  Plaintiff complained of tenderness in the mid back area, but there was no deformity and he had an "excellent range of motion."

Plaintiff's upper extremities were normal except for a scar in the anterior left shoulder area.  His lower extremities showed no bony deformity. There was minimal tenderness on palpation, and plaintiff had an excellent range of motion.  He was able to squat down on his own and get up without

-9-

much difficulty.  There was no peripheral edema and pedal pulses were present.  Plaintiff's cranial nerves II through XII were intact.  No motor or sensory deficits were noted.  Both knees were X-rayed, and Dr. Lamberty noted minimal degenerative change in the right knee.

Dr. Lamberty's diagnostic impression was (1) chronic bilateral knee pain with minimal evidence of degenerative arthritis; (2) chronic mid back pain; and (3) borderline mental functioning. He noted that the findings on the 2002 exam were "relatively minimal as they were a little over two years ago."  He did not have access to any scans showing internal derangement to the knees "but with no effusion and the excellent range of motion, it seems not terribly likely that there is significant internal derangement present."  Plaintiff's extreme weight and size, and lack of activity, all contributed to his joint problems.  Although plaintiff was not a candidate for heavy strenuous activity (because of the chronic knee and back pain), he certainly appeared to be capable of something requiring intermittent standing, sitting, light lifting, bending.  Plaintiff's borderline mental functioning would obviously limit plaintiff's ability to do tasks requiring any computation or significant mental intervention.

A Mental Residual Functional Capacity Assessment (MRFC) completed on July 23, 2004 (Tr. 683-686) indicated that the plaintiff was moderately limited in the ability to understand and remember detailed instructions; the ability to carry out detailed instructions; and the ability to maintain attention and concentration for extended periods.  He was not significantly limited in any other category.

The Psychiatric Review Technique completed in August 2006 (Tr. 694-709) reflects an organic mental disorder of borderline intellectual functioning (BIF).  As the result of this disorder, plaintiff suffered a mild degree of limitation as to (1) activities of daily living, (2) maintaining social

-10-

functioning, and (3) maintaining concentration, persistence or pace. There was insufficient evidence to determine whether the plaintiff was limited due to "Episodes of Decompensation, Each of Extended Duration." (Tr. 705). This report concludes:

> The claimant is a 41 year old male who alleges disability since 3/1/04 due to spinal arthritis and both knees. Physical impairment(s) will be evaluated independently.
>
> The claimant lives with his biological family. His mother does the cooking and he does not do any household chores, outside chores nor any errands. However, he does go to church. Review of the claimant[']s ADL form shows his limitations are mostly related to physical conditions instead of any discrete mental health condition. Additionally the claimant does not allege any mental health condition.
>
> The review of the medial evidence dated 3/28/02 shows the claimant was seen by Dr. Kimzey, Ph.D. for a mental CE. Dr. Kimzey, Ph.D., offers no Axis I diagnosis but on Axis II he gives the claimant a BIF diagnosis. The claimant is described as clean shaven and he understood the purpose of the interview. The claimant received special education services. On MSE, the claimant admits to no pervasive mood difficulty or affective disorder. His Insight and Judgment appear reasonable. The WAIS-III was administered and the claimants test scores show V=67, P=78 and FSIQ=70. Dr. Kimzey, Ph.D., noted the claimant appears capable of understanding and recalling short and simple instructions with ordinary supervision.
>
> In conclusion, the claimant has an MDI of BIF which would make it difficult for him to perform complex tasks and concentrate for long periods of time. However, he currently does not allege any mental conditions nor are his ADL's limited due to any mental health impairment. The claimant would be able to perform simple unskilled work at an SGA level, as outlined in the MRFC.

The Physical Residual Functional Capacity Assessment (RFC) completed July 26, 2004 and dated August 16, 2004 (Tr. 710-719), concludes that plaintiff was limited to occasionally lifting or carrying 50 pounds; frequently lifting or carrying 25 pounds; standing and/or walking for a total of about 6 hours in an 8-hour workday; and sitting for a total of about 6 hours in an 8-hour workday. His ability to push and/or pull was otherwise unlimited. Plaintiff could occasionally engage in climbing, balancing, stooping, kneeling, crouching, and crawling. No manipulative, visual,

-11-

communicative or environmental limitations were established.  The addendum (Tr. 719) to this document reflects information that plaintiff had been seen by a doctor on January 15, 2004 after falling and having severe pain in his mid-back.  His weight was 347 pounds.  He had back trouble before.  Physical therapy was recommended.  Plaintiff was seen again on January 22, 2004 for back pain.  X-rays of the spine showed some mild degenerative change.  Dr. Michael Matthews offered "a MSO" on January 22, 2004 that plaintiff was "unable to work due to back pain, acute." (Tr. 678 & 719).  Dr. Lamberty's June 2004 report was also considered in completing the assessment.  The medical consultant concluded that plaintiff did not meet or equal any listing.  He did have trouble sleeping and reported on his ADL form that he took hydrocodone for pain.  Plaintiff would have difficulties with very strenuous work involving heavier lifting; however, he did appear capable of work activity as noted above.  The medical consultant concluded:

> Claimant's allegations are credible in that he has been treated for arthritis in spine and knees.  He describes his ADL's as having his mother helping him with his personal needs and she does all the cooking.  He does not perform household chores nor errands but does go to church.  He does note he can walk about 15-20 minutes.  He does not indicate how long he can stand but does indicate "not that much."  He can't climb stairs.  He is able to sit about one hour.  All in all, he describes fairly extreme limitations when compared with the total medical evidence and current exam.  There is not a medical basis for such extreme limitations.  Thus, claimant is found to be partially credible.

Plaintiff sought medical attention after the RFC was completed.  He was examined at the Great Plains Regional Medical Center on October 29-30, 2004 for cellulitis in the right lower leg, which he had injured four days previously.  (Tr. 720-727).  Diagnostic imaging was performed by Dr. David Hatch, who noted mild degenerative changes at the level of the knee with some spurring.  There was fairly diffuse soft tissue swelling with degenerative/posttraumatic findings.  There was

-12-

no lytic destructive lesion or significant periosteal reaction over the distal one-third right lower extremity to suggest osteomyelitis.  There was some old periosteal thickening at the proximal one-third posterior aspect of the tibia, but it had a fairly old and benign appearance potentially due to chronic venous stasis.  Plaintiff displayed normal ranges of motion of his extremities, and a normal gait on October 30, 2004.  His right leg was tender and swollen at the anterior and lateral aspect.  On November 1, 2 and 3, 2004, Plaintiff showed symmetry in movement and strength of all extremities with intact sensation and full ranges of motion.  His gait was steady and independent without pain.  On November 4, 2004, Plaintiff displayed a steady gait, was alert, and voiced no respiratory complaints.

On February 25, 2005, plaintiff was admitted to Great Plains Regional Medical Center and discharged the same day for painful cellulitis of the right leg and hip.  (Tr. 751-752).  No cause was identified, and Plaintiff had similar symptoms many times previously.  On examination, Plaintiff's extremities were normal and non-tender.  He was oriented with no motor or sensory deficits.  Plaintiff was given IV antibiotics and told to take Tylenol or Motrin as needed.

On July 9, 2005, plaintiff was seen at the Great Plains Regional Medical Center after he suffered a burn to his left hand or wrist while he was welding the day before.  On examination, he exhibited normal ranges of motion in his extremities.  The wound was cleaned and dressed, and Plaintiff was instructed to elevate his left arm, apply ice intermittently, watch for signs of infection, take Darvocet as needed for pain, and apply burn cream.

Plaintiff returned to the Great Plains Regional Medical Center on August 23, 2005 (Tr. 472-476), for treatment of a painful sore or boil on his left upper arm.  At that time, plaintiff was oriented, had no motor deficits, and his extremities were non-tender.  The doctor's notes reflect that

-13-

plaintiff was "well-known to the ER for developing boils that progress to cellulitis requiring IV antibiotics." (Tr. 475). The doctor did not place any restrictions on plaintiff's activity, prescribed a seven-day course of Augmentin, and instructed Plaintiff to take over-the-counter pain medication as needed.

Plaintiff received prescriptions for ibuprofen (800 mg) in December 2005 and January 2006 after complaining of back pain.

On February 28, 2006, plaintiff was examined by Dr. David Lindley. Plaintiff advised Dr. Lindley that he has had right knee pain since 1999, his knee "gives out," and it is extremely painful to walk on it. The knee did not swell up and plaintiff said he did not use a cane, but does sometimes fall over. Plaintiff complained to Dr. Lindley of constant pain and reported he could only walk half a block before he had to sit down. When he sat down, the knee was not too bad. Plaintiff also reported that he had persistent lower back pain, which started in 1999. He said he had received cortisone shots, which did not work. The pain shoots down into his buttock and then down the lateral aspect of both thighs. Plaintiff told Dr. Lindley he could stand for about 20 minutes, sit for about 30 minutes, then has to get up and walk around. Laying down was okay. He could bend, but could only lift about 10 pounds before getting severe pain in his back and right knee. He denied any tingling or numbness or weakness in his legs. He denied weakness in his arms, but reported tingling in his fingers intermittently. He denied any other joint problems.

Plaintiff advised Dr. Lindley that his last job was in 1999 moving furniture for 25 years, but he was unable to do that work any more because of his physical condition. He was taking medication for hypertension and 800 mg of Motrin twice a day. He was 6 feet 10 inches tall and weighed 371.4 pounds. Upon examination, plaintiff was tender in the paralumbar muscles. He was

-14-

tender "on movement of the right knee but no effusion or true ligament laxity but tender over the medial and later joint line and also tender posteriorly with a Baker's cyst present." X-rays taken of the right knee showed "lots of joint space in a standing x-ray in AP and lateral views with sclerotic changes consistent of significant osteoarthritis." The left knee was unremarkable. Although the report makes vague reference to a reduction in range of movement in the spine, that point was not specifically discussed. Cranial nerves were intact and normal, and muscle tone, power, coordination, and sensation were intact. Dr. Lindley's diagnostic impression was (1) osteoarthritis right knee, and (2) osteoarthritis and probable degenerative disc disease in lumbar spine. Dr. Lindley concluded that the plaintiff "clearly has skeletal problems which are going to limit the ability to do any work for which he's trained." (Tr. 462).

In February and March 2006, plaintiff received medical attention for a cold and cough.

On April 3, 2006, plaintiff received treatment at the Great Plains Regional Medical Center for a lesion on the right upper extremity, consistent with a superficial staph infection. Plaintiff was instructed to clean the sores twice a day with mild soap and water and apply antibiotic ointment. He was discharged in good condition and drove home.

Dr. George Weilepp, an orthopedic surgeon, was provided copies of the plaintiff's medical records and participated in the May 25, 2006 hearing by telephone. (Tr. 828-841). Based on those records, and the plaintiff's testimony, Dr. Weilepp testified that the plaintiff was 43 years old and 6 feet 10 inches tall. The plaintiff testified he weighed about 300 pounds. Plaintiff was hypertensive, moderately obese, and had both knee and back problems. He has had no surgery, but has had injections for pain. He had reticular symptoms, but no reticulitis or radiculopathy. Plaintiff had no atrophy. He, had a functional range of motion, both of his knee and his back. Plaintiff had pain of

mild degree treated with anti-inflammatories and muscle relaxants.  He had no re-injury between March 2004 and the time of the hearing.  His preexisting history was remote; his original injury was as early as 1976 when he fractured his femur in a motor vehicle accident.  Plaintiff had a motorcycle accident in the 1990s, but did not suffer any orthopedic injuries of significance at that time.  The medical records showed that plaintiff's knee pain began around 1999.  He stopped working during or after 1999.  There have been no long term implications of plaintiff's hypertension.  Plaintiff's knee symptoms were treated with injections, but no bracing.  Between 2001 and 2003, an orthopedist either advised or considered using a brace of some kind.  Plaintiff has used a cane intermittently, but a cane was not prescribed by any physician in the record.  Plaintiff had no medications for non-exertional issues and had no complications or side effects to his medications.  According to Dr. Weilepp, the plaintiff had reasonable orthopedic care, at least up until 2003-2004.  The doctor reviewed the MRI and orthopedist's evaluation of December 2002 and an x-ray at C2F4 taken in January 2004.

After reviewing the most current materials, Dr. Weilepp opined that plaintiff currently functioned at a restricted light capability.  Previously, the plaintiff functioned in a medium level with marginal preventive restrictions based on the types and severity of his pain and injuries to the knees and back.  Dr. Weilepp testified that plaintiff would be able to sit 6 hours or more, at least 2 to 2½ hours at a time, and stand and walk 4 to 6 hours, at least 1½ hours at a time.  Heights and ladders were precluded completely due to plaintiff's knees, back and obesity.  Ramps and stairs are allowed, but required stairs in excess of one flight is precluded.  Frequent kneeling, crawling and squatting are precluded with back disease and knee problems of this type, although plaintiff could perform those activities occasionally.  Occasional cold and occasional industrial vibration issues were not

precluded.  Due to plaintiff's knee and back problems, it was suggested (but not required) that he have smooth surfaces most of the time, but not all the time.  Industrial driving was precluded due to plaintiff's medications, pain and lower extremity controls.  The operation of highly dangerous equipment with the upper and lower extremities was precluded due to the issues of discomfort.  Light industrial driving was not precluded.

During the hearing, the ALJ noted that record showed the plaintiff weighed 371 pounds when he was examined by Dr. Lindley on February 28, 2006.  Plaintiff testified he had not lost any weight.  Dr. Weilepp agreed that the 71-pound difference would affect the plaintiff's residual functional capacity.  The plaintiff did have a really good functional range of motion.  He did have a loss of length on one leg dating from 1976 when his femur was fractured.  Dr. Weilepp did not believe the plaintiff needed a "sit/stand."  Nor did he believe the plaintiff had a severe pain disorder; his disorders were treatable or were under treatment.  Although the plaintiff had conditions that would cause mechanical symptoms with overdoing, he would have only marginal restrictions and problems at a light level versus a medium level.  These conclusions were based on the medical history and the MRI taken in 2002.

Dr. Weilepp disagreed with the more severe restrictions imposed by Dr. McGowan in 2002.  He could find no objective or reasonable evidence to support severe restrictions, since the plaintiff could walk three city blocks.  The information in Dr. McGowan's report or checklist (Tr. 339-346) characterized plaintiff's back issue as "chronic, intermittent, reactive to a short leg, reactive to his height when he bends over and occasional kneel, crawl or squat are not precluded as a result of those issues."  Based on the objective data, Dr. Weilepp would not restrict the plaintiff to sedentary level

activity.  He believed the plaintiff could work an 8-hour workday, but would only be able to be on

his feet for 4 to 6 hours.

The ALJ observed that the plaintiff's prior experience involved heavy or very heavy work.

The ALJ posed the following hypothetical question to vocational expert Gail Leonhardt:

> [T]he first question I have is for step five type of jobs, other work, in the broad world
> of work for someone who is younger, has a limited education from a functional
> standpoint and can, and has the functional capacity that Dr. McGowan has described.
> The relevant points are that he could lift or carry 20 pounds occasionally, 10 pounds
> frequently, the sitting six hours in an eight hour day for two hours at a time, standing
> ... sitting two hours, six hours a day, at least an hour and a half at a time, standing or
> walking four to six hours a day in two hour increments, avoid ladders, ropes,
> scaffolds, stairs not more than one flight at a time, he could occasionally do postural
> activities, avoid extremes of temperature or industrial vibration, and should
> preferably work on smooth surfaces, avoid uneven surfaces.  With that functional
> capacity can you identify any light or sedentary work that someone of this vocational
> profile could perform?

(Tr. 842-843).

In response, the Vocational Expert stated she could not generally justify light work activity

due to the doctor's restrictions as to standing and walking.  The plaintiff would qualify for sedentary

activity and, considering plaintiff's educational development, would be able to do sedentary unskilled

jobs such as production assembler or hand packager.  Certain light jobs which allowed for some

postural change within the day and consistent with the "four to six stand/walk and sit six in eight"

restriction would also be appropriate.  Light jobs allowing the employee to sit/stand at will would

also be consistent with this restriction.  According to the Vocational Expert, there were 1,000

production assembler and 2,500 hand packager jobs existing in the four-state region consisting of

Nebraska, Iowa, Missouri and Kansas.  Those jobs were strictly sedentary.  There were also 1,600

light level jobs (office document preparer, collator operator, general office helper) existing in the

four-state region that would accommodate the plaintiff's restrictions.  (Tr. 846).  There were approximately 800 light level parking lot attendant jobs with a sit/stand option that would be appropriate for the plaintiff's restrictions.  All of these job positions would satisfy the requirement that plaintiff have routine repetitive work that is easily learned, where he would not have to set goals or deal with job changes.  Finally, the Vocational Expert opined that plaintiff would not be able to do about half of the light unskilled work available in the region because the jobs would require being on his feet for more than was allowed.  Plaintiff would, however, be able to perform almost the full range of unskilled sedentary work.  Plaintiff's education would not affect his ability to perform unskilled clerical jobs.  Considering Dr. McGowan's opinion that plaintiff would likely be absent from work about twice a month due to his restrictions, the Vocational Expert still believed the plaintiff would be able to sustain work, although some employers would fire him if special arrangements were not made.

## III.  LAW

### A.    Standard of Review

The ALJ ultimately found that the plaintiff was not entitled to supplemental security income (SSI) benefits because he had not been under a disability within the meaning of § 1614(a)(3)(A) of the Social Security Act since March 31, 2004, the date his application was filed.  This decision, which stands as the final decision of the Commissioner, must be affirmed if it is supported by substantial evidence in the record as a whole.  *Hamilton v. Astrue*, 518 F.3d 607, 610 (8th Cir. 2008).  "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'"  *Id*. (quoting *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000)).  The court must consider the entire record, including evidence that supports as well as

detracts from the Commissioner's decision.  The court cannot reverse the Commissioner's decision simply because some evidence may support the opposite conclusion.  *Id.  See also Robson v. Astrue*, 526 F.3d 389 (8th Cir. 2008);  *McEvers v. Astrue*, 518 F. Supp. 2d 1071 (S.D. Iowa 2007).

### B.    Errors Alleged

Plaintiff contends the ALJ erred:

- by not inferring mental retardation prior to age 22 and denying benefits without addressing whether he satisfied Listing 12.05C[2],

- by failing to adopt all of the opinions of the medical expert regarding the severity of plaintiff's obesity,

- in failing to find the claimant's obesity as a severe impairment, and

- by improperly applying the *Polaski*[3] factors when determining the credibility of the plaintiff's subjective allegations of his physical and mental condition as to his limitations, restrictions and work-like activity.

### C.    The Five-Step Sequential Evaluation Process

Under the Social Security Act, the claimant must prove that he or she is disabled, that is, unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d).  The regulations promulgated by the Commissioner of Social Security, i.e., 20 C.F.R. § 416.920(a)(4), establish a five-step sequential evaluation process the ALJ must follow in a disability case.  *See, e.g.,*

---

[2]20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05 (Listing of Impairments).

[3]*Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984).

*Robson v. Astrue*, 526 F.3d 389, 391 (8th Cir. 2008).  The claimant bears the burden of proof in the first four steps.

In **Step One** the ALJ must determine whether the claimant is currently engaged in substantial gainful activity.  If not, the ALJ determines in **Step Two** whether the claimant has a severe impairment or combination of impairments significantly limiting the claimant from performing basic work activities.  If the claimant meets these requirements, the ALJ determines in **Step Three** whether the claimant has a "listed impairment," i.e., whether the  medical severity of the claimant's impairment(s) equals one of the listings in Appendix 1 of Chapter III, Part 404, Subpart P.[4]  If the claimant does not have a listed impairment, the ALJ continues to **Step Four** and determines whether the claimant has sufficient residual functional capacity ("RFC"), despite the impairment or various limitations, to perform his or her past work.  At **Step Five**, if the claimant cannot perform his or her past work, the burden shifts to the Commissioner to show the claimant can perform other work that exists in significant numbers in the national economy.

**D.    Discussion**

The ALJ determined at Steps One and Two that the plaintiff had not engaged in substantial gainful activity during the relevant time period and did suffer from a severe combination of impairments: borderline intelligence, bilateral knee pain with degenerative arthritis, and chronic lumbar disease.  These impairments significantly limited the plaintiff from performing basic work activities.

The ALJ found at Step Three that the plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404,

_____

[4]20 C.F.R. Pt. 404, Subpt. P, App. 1

-21-

Subpart P, Appendix 1.  Plaintiff disagrees, contending that his impairments meet or equal listed

impairment 12.05C, which provides:

> **12.05 Mental retardation:**  Mental retardation refers to significantly subaverage
> general intellectual functioning ***with deficits in adaptive functioning*** initially
> manifested during the developmental period; i.e., the evidence demonstrates or
> supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B,
> C, or D are satisfied.
>
> C.    A valid verbal, performance, or full scale IQ of 60 through 70 and a physical
>       or other mental impairment imposing an additional and significant work-related
>       limitation of function[.]

(Emphasis added).  The requirements in the introductory paragraph are mandatory.  *Maresh v.*

*Barnhart*, 438 F.3d 897, 899 (8th Cir. 2006).  A formal diagnosis of mental retardation is not

required.  *Id.*  "In sum, to meet Listing 12.05C, a claimant must show:  (1) a valid verbal,

performance, or full scale IQ of 60 through 70; (2) an onset of the impairment before age 22; and (3)

a physical or other mental impairment imposing an additional and significant work-related limitation

of function."  *Maresh v. Barnhart*, 438 F.3d at 899.

In this case, there has been no formal diagnosis of mental retardation; however, the record

is well documented with various diagnoses describing the plaintiff as "slow" or as having Borderline

Intellectual Functioning.  The evaluation conducted in 2002 showed plaintiff had a full-scale IQ of

70.  While the plaintiff has shown that he does have significantly subaverage general intellectual

functioning, the lengthy record does not tend to support the conclusion that he has any deficits in

adaptive functioning which were initially manifested before the age of 22.  There is substantial

evidence of record to the contrary.

-22-

Here, the plaintiff was able to graduate from high school through special education. He was considered to be a good candidate for job training. He worked on a regular basis for many years and alleged in his application for benefits that he stopped working only because of his physical limitations. He has not been diagnosed with any Axis I clinical disorder. He continues to drive an automobile. He did not raise any issue of mental retardation before the ALJ. Rather, the plaintiff testified at his hearing that he had limitations due to physical problems and could not find or hold a job because of his conviction for sexual assault.[5] The majority of professionals who have examined or evaluated the plaintiff have concluded he is only moderately limited in the ability to understand, remember, and carry out detailed instructions. He is only moderately limited in the ability to maintain attention and concentration for extended periods. The plaintiff has only a mild degree of limitation in the activities of daily living, maintaining social functioning, and maintaining concentration, persistence or pace.

Considering the record as a whole, the court finds the plaintiff has not met his burden in proving that his impairments meet or equal listed impairment 12.05C.

At Step Four, the ALJ determined that the plaintiff did not have sufficient RFC to perform his past work and continued to Step Five, which requires the Commissioner to show that the plaintiff can perform other work that exists in significant numbers in the national economy. At Step Five the

---

[5]The court may not consider the plaintiff's criminal history in determining whether he was capable of performing a significant number of jobs that exist in the national economy, as a felony conviction is neither a medically determinable impairment nor a functional limitation caused by a medically determinable impairment. *See Saucedo v. Barnhart*, 2004 WL 2303451 at *7 (D. Utah, Oct. 12, 2004). "Furthermore, Plaintiff's felony convictions should not give him an advantage over another SSI claimant who has no felony convictions. The Social Security Administration has explained that it will not consider non-medical factors that disallow a claimant from finding work. *See* 20 C.F.R. § 416.966(c)." *Id*.

-23-

Commissioner may rely on a vocational expert's response to a properly formulated hypothetical question.  Testimony from a vocational expert is substantial evidence when the testimony is based on a correctly phrased hypothetical question that captures the concrete consequences of a claimant's deficiencies.  *Robson v. Astrue*, 426 F.3d at 392.

As a basis for the hypothetical question posed to the Vocational Expert in this matter, all of the professionals consulted in this case specifically considered the plaintiff's height and weight in reaching their findings, diagnoses and recommendations.  The ALJ's decision specifically notes that the plaintiff weighed 371 pounds at the time of his hearing.  (Tr. 23).  Dr. Lamberty had observed that the plaintiff's extreme weight and size, and lack of activity, all contributed to his joint problems.  The record simply does not support the plaintiff's assertion that the ALJ somehow rejected a diagnosis of obesity or disregarded the fact of his obesity as an impairment.

It appears to this court that the ALJ carefully considered all of the plaintiff's impairments and limitations, individually and in combination, and properly limited plaintiff to work which is unskilled, routine, repetitive, and easily learned.  The court finds that the hypothetical posed to the Vocational Expert during the hearing accurately described the plaintiff's documented limitations and accounted for the plaintiff's BIF.  *See generally Robson v. Astrue*, 526 F.3d 389 (8th Cir. 2008).

Finally, the plaintiff contends the ALJ did not properly apply the *Polaski* factors when determining the credibility of his subjective allegations of his physical and mental condition.

An ALJ may resolve conflicts among various treating and examining physicians, assigning weight to the opinions as appropriate.  *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001). Both physical and mental limitations must be considered.

A disability claimant's subjective complaints of pain may be discounted if inconsistencies in the record as a whole bring those complaints into question.  *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984).  In assessing the credibility

-24-

of a claimant's subjective pain complaints, an ALJ is to consider factors including the claimant's prior work record; the claimant's daily activities; observations of the claimant by third parties and treating and examining physicians; the duration, frequency, and intensity of the claimant's pain; precipitating and aggravating factors; the dosage, effectiveness, and side effects of the claimant's medication; treatment, other than medication, for relief of the claimant's pain; and functional restrictions on the claimant's activities. *See id.* Although "an ALJ may not disregard [a claimant's] subjective pain allegations solely because they are not fully supported by objective medical evidence, an ALJ is entitled to make a factual determination that a [c]laimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary." *Ramirez v. Barnhart*, 292 F.3d 576, 581 (8th Cir. 2002) (internal citation omitted); *see also Goodale v. Halter*, 257 F.3d 771, 774 (8th Cir. 2001) (noting that an ALJ may discount subjective complaints if there are inconsistencies in the evidence as a whole), *cert. denied*, 535 U.S. 908 (2002).

*Gonzales v. Barnhart*, 465 F.3d 890, 895 (8th Cir. 2006) (parallel citation omitted).

In this case, the ALJ discredited, to a point, the plaintiff's complaints of extreme pain based on the fact that he had recently injured himself while welding[6], his history of taking only ibuprofen as a pain medication, and his medical records. The majority of the recent medical records reflected that the plaintiff walked normally and had an excellent range of motion. Based on a thorough review of plaintiff's medical records, Dr. Weilepp did not believe the plaintiff had a severe pain disorder, as his disorders were treatable or were under treatment.

The court finds that the record does not support the degree of limiting pain alleged by the plaintiff and that the ALJ's decision is supported by substantial evidence on the record as a whole.

## CONCLUSION

The court finds that the plaintiff was given a fair hearing and full administrative consideration in accordance with applicable statutes and regulations. For the reasons discussed

---

[6]While the welding incident could be construed as an indication that the plaintiff's impairments prevented him from safely performing that task, it is noteworthy that the plaintiff's allegedly severe level of pain did not prevent him from doing welding when he wanted to do so.

-25-

above, the court concludes that the Commissioner's decision is supported by substantial evidence on the record as a whole and should be affirmed.  Accordingly,

**IT IS ORDERED** that the decision of the Commissioner is affirmed, the appeal is denied, and judgment in favor of the defendant will be entered in a separate document.

**DATED June 30, 2008.**

**BY THE COURT:**

**s/ F.A. Gossett**
**United States Magistrate Judge**

-26-